Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 4768 | **DATE** | 12/1/2003 |
| **CASE TITLE** | RONALD WADE vs. NATIONAL RAILROAD PASSENGER CORP. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment (doc. #13)

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]   Enter Memorandum Opinion and Order. For the attached reasons, Defendant's Motion for Summary Judgment [doc. #13] is GRANTED. All pending dates and motions are terminated as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 03 2003 | |
| | Notified counsel by telephone. | | date docketed | 26 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| JHC | courtroom deputy's initials | 03 DEC -2 PM 7:22 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

RONALD WADE, )
 )
    Plaintiff, )
 )
v. ) Case No. 02 C 4768
 )
 ) The Honorable William J. Hibbler
NATIONAL RAILROAD PASSENGER )
CORP., )
 )
    Defendant. )

**DOCKETED**

DEC 0 3 2003

## MEMORANDUM OPINION AND ORDER

Ronald Wade sued his former employer, the National Railroad Passenger Corporation, d/b/a Amtrak (Amtrak), alleging that Amtrak violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 e-2(a) *et seq*. According to Wade, Amtrak fired him because of his race and national origin. Amtrak moves for summary judgment.

### I. BACKGROUND

Wade, a native of Belize, began working for Amtrak in October 1986. He worked as a locomotive engineer throughout his tenure with the Defendant. Wade belonged to the Brotherhood of Locomotive Engineers (BLE), and a collective bargaining agreement between Amtrak and BLE governed the terms and conditions of Wade's employment.

On December 24, 2001, Wade was operating a train carrying passengers between St. Louis and Chicago. The route required Wade's train to pass through an interlocking at Joliet, where



several tracks intersect and switches control the tracks on which a train will proceed. According to the General Code of Operating Rules (GCOR),[1] locomotive engineers must operate at a "restricted speed" when passing through a "stop" signal. The GCOR defines "restricted speed" as "a speed that allows stopping within half the range a vision short of: Train, Engine, Railroad Car, Men or equipment fouling the track, stop signal or Derail or switch lined improperly..." In other words, if an engineer is operating a train at the "restricted speed" he will be able to identify whether the switches are properly aligned and stop short of a misaligned switch.

At the Joliet interlocking, a tower operator Keith Wordlaw (a Metra employee) was responsible for aligning the switches for passing trains' intended routes. As the train that Wade operated approached the Joliet interlocking, he received a stop signal, which required him to proceed only after getting an authorization either by a color light signal or from the tower operator. Shortly after 7:00 p.m., Wade received permission from Wordlaw to proceed through the signal. But even though Wordlaw had given Wade permission to pass through the stop signal, the tracks were not properly set for his intended route. Wade operated a portion of the train through the misaligned switch, causing damage to the switch and diverting the train from its intended route. After Wade operated a portion of the train through the misaligned switch, he realized that he was on the wrong track and stopped the train. Wade then requested and received permission from Wordlaw to make a reverse movement in order to realign the train in order to proceed along the proper route. During

---

[1] The General Code of Operating Rules is a set of rules and requirements for operating trains. Federal law requires railroads to certify its locomotive engineers before they become qualified to operate trains. As part of this certification process, Wade passed Amtrak's locomotive engineer certification course, which included instruction and an examination on the GCOR.

2

the reverse movement, however, the damaged switch caused the train cars to move down one track and the locomotive reversed down another track and the train derailed.

Following the derailment, both Amtrak and Metra conducted an on-site investigation of the incident. Amtrak removed Wade from service pending the investigation, since his actions potentially violated the GCOR. As a result of its investigation, Amtrak charged Wade with violating GCOR rules governing "Manual Interlockings" and "Movement at a Restricted Speed." Wade received a disciplinary hearing regarding these charges on January 16, 2002, where three BLE representatives appeared on his behalf. At the hearing, Janet Carbonelli, a Trainmaster employed by Metra, testified about her investigation. Carbonelli stated that Wordlaw informed her that Wade's train derailed shortly after Wade attempted the reverse move. Next, Amtrak Service Manager, John Hall, testified regarding his investigation of the derailment. According to Hall, when Wade proceeded through the misaligned switch, the switch was damaged, and the damaged switch later caused the derailment when Wade attempted to reverse. Hall further testified that if an engineer is traveling at restricted speed, the engineer would be able to identify whether the switches are properly aligned and stop prior to proceeding through a misaligned switch. Hall concluded that responsibility for the accident rested upon both Wade and Wordlaw. Amtrak Service Manager Larry Allen, Metra employee Jim Renfrow, and Union Representative Lisa Davis also testified at Wade's hearing, but neither party suggests that any of these witnesses' testimony influenced the hearing officer's decision. Although Wade had right to testify on his own behalf, he chose not to do so.

Hearing Officer Carl Demotses found that the testimony of the Amtrak witnesses was credible and consistent and that Amtrak had proven the charges. Demotses found that Wade was responsible for the derailment because he proceeded through the improperly aligned switch when

3

he should have been traveling at a speed that would have allowed him to stop prior to traveling through the misaligned switch. Following Hearing Officer Demotses' decision, Amtrak's General Manager of the Midwest Corridor, Steve McClarty, decided to terminate Wade. McClarty decided that termination was appropriate given Wade's disciplinary history, which included a 45-day suspension in 1993 for refusing a direct order, a 30-day suspension in 1997 for operating a train in excess of the speed limit in a restricted speed zone, counseling in 2001 for excessive absenteeism, and a 30-day suspension in 2001 for operating a train in excess of 10 mph above the speed limit.

The BLE appealed McClarty's decision to terminate Wade, but Amtrak denied this appeal. Amtrak's Director of Labor Relations Larry Hriczak found that the dismissal was not arbitrary, capricious or excessive because Wade incurred his second operating rule violation in ten months and his third in four years, and also because each of the prior violations involved speeding. BLE then requested a hearing before the Special Board of Adjustment, a three member arbitration panel, consisting of a neutral chairperson, a member representing Amtrak and a member representing the Union. The Board likewise denied BLE's claim and upheld the termination.

Wade claims that he was fired because of his race (African American) and his national origin (Belizean), pointing out that Allen told him at his hearing that he was being "set up" and that the Amtrak employee who charged him with the violations that led to his termination, Norel Pride, "had a history of singling [Wade] out because of his Belizean accent and his race."

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, and other materials in the record show that there is no disputed material fact and that the moving party is entitled to

4

judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). This Court considers the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1057 (7th Cir. 2000). The non-moving party, however, must make a showing sufficient to establish any essential element for which he will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322-23. Summary judgment should be granted when the record as a whole shows that a rational trier of fact could not find for the non-moving party. *Rogers v. City of Chi.*, 320 F.3d 748 (7th Cir. 2003) (citing *Commercial Underwriters Ins. Co. v. Aires Envtl. Servs.*, 259 F.3d 792, 795 (7th Cir. 2001)).

Before proceeding to the merits, a brief refresher on the rules of civil procedure is necessary, for Wade's Local Rule 56.1 statement of facts and his Memorandum in Opposition to Defendant's Motion are insufficient. Local Rule 56.1 requires that a party opposing a motion for summary judgment file a concise response to the movant's statement of facts that shall contain, among other things, "a response to each numbered paragraph in the moving party's statement . . . ." Wade fails to respond to the vast majority of Amtrak's statements of fact. Indeed of the 62 statements contained in Amtrak's 56.1(a) statement, Wade provides responses to only 19 statements of fact. Accordingly, any fact to which Wade failed to respond is deemed admitted. *See* Local Rule 56.1(b)(3); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Further, several of the 19 responses that Wade does provide fail to properly controvert Amtrak's statement. For example, Wade denies several subparts to Amtrak's Statement Nos. 40 and 44 regarding the testimony of Carbonelli and Hall at Wade's disciplinary hearing. But Wade offers no evidence to suggest that Amtrak has misquoted or mischaracterized the testimony. Instead, Wade takes issue with the conclusions that Carbonelli and

Hall have drawn. Wade's statement does not contradict the substance of Amtrak's statement; it is simply argumentative. Evasive and argumentative statements are inappropriate because they do not assist the court in identifying the material facts that are in dispute, and courts in the past have stricken entire statements when the court must wade through improper denials and legal argument in search of disputed facts. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 528 (7th Cir. 2003); *Market v. Illinois Bell Tel. Co.*, No. 01 C 3841, 2003 WL 22697284, *4-5 (N.D. Il. Nov. 13, 2003). In this case, however, the Court will strike only Wade's responses to Amtrak's statements 40 and 44 and, thus, consider Amtrak's statements admitted. Finally, Wade frequently relies on inadmissable hearsay to show that summary judgment is inappropriate. For example, he states that Allen told him he was being set up. But Wade does not offer a deposition or affidavit from Allen supporting this testimony, and instead points only to his own declarations claiming that Allen made such a statement. Hearsay, however, is incapable of creating a genuine issue of material fact. *Woods v. City of Chi.* 234 F.3d 979, 988 (7th Cir. 2000), *Winskunas v. Birnbaum*, 23 F.3d 1264, 1268; *see also American Nat'l Bank and Trust Co. of Chi.*, No. 01 C 1395, 2003 WL 1712561 (N.D. Ill. Mar. 28, 2003) (refusing to consider hearsay statements in summary judgment stage); *Shannon v. Sheahan*, No. 01 C 252, 2003 WL 366584 (N.D. Ill. Feb. 18, 2003) (same).

Not only is Wade's 56.1 Statement of Facts insufficient, so too is his Memorandum in Opposition to the Defendant's Motion. Wade's Memorandum contains no statement of fact. The purpose of a Local Rule 56.1 statement of facts is not to replace the statement of facts section of a memorandum of law. *Cleveland v. Prairie St. Coll.*, 208 F. Sup. 2d 967, 972-73 (N.D. Ill. 2002). By neglecting to include a statement of facts in his memorandum, Wade forces the Court to sift

through his Local Rule 56.1 statement in order to identify the proper sequence of events and recreate the factual background.

## III. ANALYSIS

Title VII makes it unlawful for an employer to discharge any individual because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000 e-2(a). A plaintiff can overcome a defendant's summary judgment motion in an employment discrimination case by using either the direct method or the indirect method. Under the direct method, the plaintiff must show an acknowledgment of discriminatory intent by the employer or circumstantial evidence from which an inference of discriminatory intent can be drawn. *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001). Under the indirect, burden-shifting method described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), a plaintiff may establish a *prima facie* case of discrimination by showing that he (1) is a member of a protected class; (2) was meeting his employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees outside the protected class, after which the burden shifts to the employer to offer a legitimate non-discriminatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 801-03. If the employer comes forward with such a reason, the burden returns to the plaintiff to produce evidence sufficient to show that the reason is pretextual. *Id.*

Wade has no direct evidence that he was fired because of his race or national origin — there is no smoking gun revealing the Defendant's discriminatory intent. Instead, Wade relies on circumstantial evidence to support his claims. *See Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935,

7

939 (7th Cir. 2003) (plaintiff may rely on circumstantial evidence under direct method, but "circumstantial evidence . . . must point directly to a discriminatory reason for the employer's action . . . .") Wade first points to remarks made by Norel Pride, Wade's immediate supervisor, as evidence that he was terminated because the employer (or in this case, the employer's agent) harbored an illegal discriminatory motive. According to Wade, Pride mocked his Belizean accent and criticized him for dating a white female employee. Wade also claims that "it was clear that Pride favored white employees over black employees . . . [because he] was friendlier with the white employees and was on a first name basis with them." Wade further claims that Pride's improper animus was shared by Stan Allison, a white engineer, who told him that he did not "belong here." Finally, Wade states that at his disciplinary hearing, Allen approached him and told him that "they [Amtrak] set you up." Wade's argument is unconvincing. First, there is no solid evidence in the record to support Wade's allegations. He cites only to his deposition testimony and his self-serving affidavit in which he offers the out of court declarations of Pride, Allison, and Allen for their truth—relying impermissibly on hearsay. When responding to a summary judgment motion, a party must identify evidence of a type admissible at trial to create an issue of material fact. *See Adams*, 324 F.3d at 939; *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1998) (rejecting plaintiff's efforts to establish racial motive through hearsay evidence); Fed. R. Civ. P. 56(e).

But even putting aside hearsay concerns, the evidence offered by Wade is insufficient to create a genuine issue of material fact. Neither Pride nor Allison, both of whom Wade identifies as harboring improper discriminatory motives, were the decision-maker in the case. Although Pride charged Wade with violating the GCOR, the question of whether Wade had violated those rules was

answered by Hearing Officer Demotses and the decision to terminate Wade was made by McClarty, and statements by nondecision-makers cannot satisfy a plaintiff's burden of proving discrimination. *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 492 (7th Cir. 2002). Wade offers nothing to connect the alleged discriminatory views of Pride and Allison to the actions of the decision makers, Demotses and McClarty. "[B]igotry, *per se*, is not actionable. It is actionable only if it results in injury to a plaintiff; there must be a real link between the bigotry and an adverse employment action." *Gorence*, 242 F.3d at 762. Even assuming that Pride and Allison harbored improper discriminatory views, Wade has not shown that they infected the decision making process. Similarly, Allen's alleged passing reference to the fact that Wade was "set up" is insufficient to demonstrate that Wade was discharged for an illegal reason. Even if Wade had presented admissible evidence that Allen had told him he was being set up, he presents no evidence to suggest that Allen believed that Wade was set up *because of* his race or national origin. Wade had the opportunity to depose Allen so that Allen could elaborate on the cryptic comment allegedly made outside the hearing room, but declined to do so.[2]

In the absence of evidence sufficient to proceed under the direct method, Wade must rely on the familiar *McDonnell Douglas* "burden-shifting" method of proof. Wade, however, cannot establish a *prima facie* case of discrimination under the *McDonnell Douglas* test because he cannot show that he was meeting his employer's legitimate expectations or that similarly situated employees outside the protected class were treated more favorably.

---

[2] Wade also declined to question Allen at the hearing despite the fact that Allen approached him with this more than helpful information.

9

Wade focuses much of his argument that he was meeting his employer's legitimate expectations by rehashing the details of the derailment. Wade continues to argue that the derailment was Wordlaw's fault, and not his. Wade, however, had a disciplinary hearing where he was represented by three Union members during which he presented his view that he was not responsible for the accident. After a thorough review, the Hearing Officer sustained the charges against Wade and determined that he violated the GCOR "restricted speed" rule and that he was partially responsible for the derailment, a decision upheld by the Special Board of Adjustments. Despite Wade's efforts to shift responsibility for the derailment to Wordlaw, the law in this circuit is clear: an employee's own assertions that his performance is satisfactory are not sufficient to prove that he met the employer's legitimate expectations. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994). Wade had the opportunity to convince his employer that the derailment was Wordlaw's fault and not his, and could not do so.[3]

Wade also argues that he was meeting his employer's legitimate expectations because he was operating at restricted speed (despite the conclusion to the contrary reached by Hearing Officer Demotses). But Wade merely denies that he violated the operating rule by offering his own interpretation of the rule. He claims that he was operating at restricted speed because he did stop short of the switch as he approached the Joliet interlocking and received a stop signal. But Amtrak expected that an engineer operating at restricted speed be able to spot a misaligned switch before

---

[3] If a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner, the second and fourth prongs merge and allow the plaintiff to proceed to the pretext inquiry. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002). Wade makes no such argument and offers no evidence to suggest that his hearing was a sham, other than the alleged comment made by Allen, which as the Court noted earlier, is hearsay.

proceeding over it. Wade claims that he could not do so because the complexity of the switch and the nighttime conditions made it difficult for him to discern the misaligned switch. Wade's argument is unconvincing because courts can not redefine employers' legitimate expectations. *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002); *see also Foster v. Arthur Anderson, L.L.P.*, 168 F.3d 1029, 1035 (7th 1999) (refusing to question a termination pursuant to a policy requiring employees to notify the employer if they would be late). Amtrak expected its locomotive engineers to follow the GCOR operating rules, to see a misaligned switch, and to stop before proceeding over it. Wade failed to do so, and cannot show that he was meeting his employer's legitimate expectations merely by questioning whether Amtrak's expectations were reasonable.

Wade also cannot demonstrate that similarly situated employees outside the protected class were treated more favorably. To show that another employee is "similarly situated," a plaintiff must show that there is someone who is comparable to her in all material respects. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir.2002). Generally, a plaintiff must establish that he and the other employee dealt with the same supervisor, were subject to the same rules and standards, and engaged in a similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 580 (7th Cir. 2003). Wade must thus show that he was not different from his comparators with respect to performance, qualifications, or conduct. *Durkin v. City of Chi.*, 341 F.3d 606, 613-14 (7th Cir. 2003). Wade attempts to demonstrate that Amtrak treated similarly situated white or non-Belizean employees more favorably by comparing himself to the tower operator Wordlaw, a Metra employee. Wade suggests that Wordlaw is an appropriate

11

comparator because Wordlaw, like Wade himself, was obligated to follow the GCOR rules. But Wordlaw was an employee of Metra, not Amtrak. Simply because Wordlaw was required to follow the same regulatory rules does not meant that Metra must look to Amtrak (or vice versa) to determine appropriate discipline for its employees. Wade also points to six Amtrak engineers, all of whom were disciplined, but not terminated, for damaging switches or causing derailments or similar accidents. None of the potential comparators, however, had a disciplinary record as extensive as Wade's record, and thus cannot be considered as similarly situated. First, none of the other six engineers had been cited for speeding within a year of their discipline, as Wade had been. Moreover, while Wade had received a total of three suspensions of thirty days or longer before his termination, only two potential comparators, R. Black and M. Fritz, had received even one 30-day suspension, which they received fifteen and six years, respectively, *prior* to the most recent discipline. Wade argues that the Court should not consider his previous disciplinary history because it was improper and also motivated by a discriminatory animus. But Wade again relies on his own assessment of his prior disciplinary issues, pointing to self-serving statements in his affidavits and deposition. *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993) (self-serving affidavits insufficient to defeat summary judgment). Wade never filed any charge alleging that these prior disciplinary actions were the product of discrimination and cannot advance any such claim now. Finally, the five of the six engineers that Wade offers as comparators accepted responsibility for their rule violations and waived their right to a formal hearing, unlike Wade. Given Wade's extensive disciplinary history and his refusal to accept responsibility for his accident, the other six employees cannot be considered to be similarly situated. *See Greer v. Amesqua*, 212 F.3d 358, 370 (7th Cir. 2000) (employees lacking similar disciplinary history not similarly situated).

Wade cannot establish a *prima facie* case of discrimination, but even if he could, his claims would still fail because he cannot demonstrate that Amtrak's reason for terminating him was pretextual. Amtrak offered a legitimate, nondiscriminatory reason for its action—that Wade violated the GCOR rule which caused the derailment, which warranted termination given Wade's extensive disciplinary history. To establish pretext, Wade needs to show that Amtrak's reasons for terminating him had no basis in fact, did not actually motivate the decision, or were insufficient to support the decision. *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002). In determining whether an employer's proffered reason for an employment action was pretextual, the court is not concerned with whether the employer made a bad decision, but rather the focus of the inquiry is whether the employer honestly believed in the reasons it offered. *Wade v. Lerner New York, Inc.*, 243 F.3d 319, 323 (7th Cir. 2001). "The federal anti-discrimination laws do not authorize judges to sit as a kind of 'super-personnel department' weighing the prudence of employment decisions." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997). Furthermore, it is not relevant whether Wade actually violated the rule, it only matters whether the decision maker (in this case McClarty) honestly believed that Wade violated the rule. "[A]rguing about the accuracy of the employer's assessment is a distraction ... because the question is not whether the employer's reasons for a decision are '*right* but whether the employer's description of its reasons is *honest*.' " *Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir.1997) (quoting *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992)) (internal citation omitted) (emphasis in original).

Wade attempts to establish pretext by contending that McClarty did not honestly believe that Wade violated the GCOR rule because McClarty acknowledged that Wordlaw also violated the

13

GCOR rules and was partially responsible for the accident. But merely because McClarty acknowledged that Wordlaw was partially responsible for the accident does not demonstrate that McClarty did not honestly believe that Wade was also accountable for the accident or that he did not honestly believe that Wade failed to operate his train at restricted speed. McClarty testified that tower operator's violations contributed to the derailment, but he also testified that Wade violated the GCOR rule governing "restricted speed" and that Wade was partly to blame for the accident.

Grasping at straws, Wade launches a second conspiracy theory, this time directed at McClarty, claiming that Union officials told him that McClarty was out to get him. But Wade offers no evidence in support of this conspiracy theory, other than his self-serving statements. As noted earlier, Wade cannot defeat summary judgment by relying upon inadmissible hearsay in an affidavit or deposition. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996). The undisputed facts show that Amtrak reached its decision after Wade received a hearing, represented by three union members, and Wade has offered no evidence that McClarty did not honestly believe the findings made by the Hearing Officer.

## IV. CONCLUSION

The Court holds that Wade has pointed to no evidence, direct or circumstantial, to create a genuine issue of material fact as to whether he was fired because of his race or national origin, and thus cannot overcome Defendant's summary judgment under the direct method. Further, Wade has not established that he was meeting his employers legitimate expectations, that other similarly situated employees outside the protected class were treated more favorably, or that Amtrak's

proffered reason for discharging him was pretextual, and thus cannot overcome Defendant's summary judgment under the indirect burden-shifting method. Defendant's motion for summary judgment is GRANTED.

IT IS SO ORDERED.

12/1/03
Dated

The Honorable William J. Hibbler
United States District Court